**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

DENISE DUNNE, TAMARA LASHCHYK, and RICHARD C. MANJARRES, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,

Defendants.

Before: Leo M. Gordon, Judge

Court No. 2:25-cv-18105

**OPINION and ORDER**

[Granting Defendants' Motion to Dismiss.]

Dated: November 13, 2026

Jason Cyrulnik, Cyrulnik Fattaruso LLP, of New York, NY, argued for Plaintiffs Denise Dunne, Tamara Lashchyk, Richard C. Manjarres, and the proposed class. With him on the brief were Paul Fattaruso and Steven Magnusson. Also on the brief was James F. Moscagiuri, Lavery, Selvaggi, & Cohen, P.C., of Hackettstown, NJ, as well as Daniel Huff of Sharon, MA.

Roberta A. Kaplan and D. Brandon Trice, Kaplan Martin LLP, of New York, NY, argued for Defendants Metropolitan Transportation Authority and the Triborough Bridge and Tunnel Authority. With them on the briefs were Maximilan T. Crema, Kaplan Martin LLP, as well as Daniel Chorost, Mark A. Chertok, and Elizabeth Knauer, Sive, Paget & Riesel, P.C., of New York, NY.

Gordon, Judge[1]: In this action, Plaintiffs Denise Dunne, Tamara Lashchyk, and Richard C. Manjarres, individually and on behalf of all others similarly situated

[1] The Honorable Leo M. Gordon, Judge of the United States Court of International Trade, sitting by designation.

("Plaintiffs"), through their counsel, have brought a class action lawsuit seeking a declaration that the congestion pricing program, operated by Defendants Metropolitan Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA"), is unlawful, as well as injunctive relief (1) preventing further collection of tolls under the program, and (2) disbursing refunds of previously collected tolls. See Compl., ECF No. 1 (bringing claims for "Illegal Exaction" and "Money Had and Received").[2] Defendants maintain that the congestion pricing program is lawful as demonstrated by a number of prior judicial decisions rejecting challenges to the program.

Before the court is Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2), (b)(3), and (b)(6). See Defs.' Mot. to Dismiss, ECF No. 50 ("Defs.' Mot."); see also Pls.' Resp. in Opp'n to Defs.' Mot., ECF No. 60 ("Pls.' Resp."); Defs.' Reply Memorandum in Further Support of Mot. to Dismiss, ECF No. 67 ("Defs.'

---

[2] Plaintiffs also bring separate counts for "Declaratory Judgment" and "Injunctive Relief." See Compl. In response, Defendants move to dismiss these "requests for remedies" as they are "not independent causes of action." See Defs.' Mot. at 50 (citing 60 New Brunswick Urb. Renewal Ltd. Liab. Co. v. Navigators Specialty Ins. Co., Court No. 20-5877, 2021 WL 287876, at *6 (D.N.J. Jan. 28, 2021)). Plaintiffs suggest that under New York case law "it is permissible to plead a cause of action for a permanent injunction." See Pls.' Resp. at 34 (quoting Fika Midwifery v. Indep. Health Ass'n, 173 N.Y.S.3d 761, 767 (N.Y. App. Div. 2022)). Plaintiffs' argument and supporting citation omits critical context which states that "injunctive relief is simply not available when the plaintiff does not have any ... substantive cause of action against [the] defendants ... **Although it is permissible to plead a cause of action for a permanent injunction, permanent injunctive relief is, at its core, a remedy that is dependent on the merits of the substantive claims asserted.**" See Fika Midwifery, 173 N.Y.S.3d at 767 (emphasis added and internal citation and quotation omitted). Accordingly, the court agrees with Defendants that Plaintiffs' third and fourth counts for declaratory judgment and injunctive relief cannot provide an independent basis for relief and must be dismissed given that the court is dismissing Plaintiffs' substantive claims contained in the first two counts.

Reply"). During the briefing of the motion to dismiss, the federal government also filed an unsolicited "statement of interest" pursuant to 28 U.S.C. § 517, presenting additional support for Plaintiffs' statutory interpretation arguments.[3] See Statement of Interest of the United States, ECF No. 64. The court held oral argument on September 17, 2026. See Oral Argument Transcript, ECF No. 73. For the reasons that follow, the court grants Defendants' motion to dismiss.

## I. Standard of Review

Federal Rule of Civil Procedure 12(b)(2) provides for dismissal in actions in which the court does not have personal jurisdiction over a defendant. See Ontel Prods. Corp. v. Mindscope Prods., 220 F. Supp. 3d 555, 559 (D.N.J. 2016). "A Rule 12(b)(2) motion ... is inherently a matter which requires resolution of factual issues outside the pleadings, i.e. whether in personam jurisdiction actually lies. Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence. ... [A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction. Once the motion is made, plaintiff must respond with actual proofs, not mere allegations." Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 67 n.9 (3d Cir. 1984) (internal citation omitted).

In deciding a motion to dismiss for failure to state a claim upon which relief can be

---

[3] The Government in its filing notes that "[t]he United States does not take a position on any other issue or argument raised by the parties." Gov't Statement of Interest at 8 n.4. The Government also declined to attend oral argument.

granted under Federal Rule of Civil Procedure 12(b)(6), the court assumes all factual allegations to be true and draws all reasonable inferences in the plaintiff's favor. See Zuber v. Boscov's, 871 F.3d 255, 258 (3d Cir. 2017). A plaintiff's factual allegations must be "enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Iqbal, 566 U.S. at 678 (2009) (quoting Twombly, 550 U.S. at 555 (2007)). Therefore, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). Instead, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Iqbal, 566 U.S. at 678 (quoting Twombly, 550 U.S. at 570).

In addition to the complaint itself, the court may also review "exhibits attached to the complaint, matters of public record, and documents that form the basis of the claim." Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d. Cir. 2004). A document forms the basis of a claim if the document is "integral to or explicitly relied upon in the complaint."

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).[4]

## II. Background

In 2019, the New York State Legislature passed the Traffic Mobility Act ("TMA"), N.Y. Veh. & Traf. Law § 1701 et seq. The TMA directed the TBTA, an affiliate of the MTA, to "establish" a "tolling program" for the Central Business District ("CBD"), defined as the geographic area of Manhattan south and inclusive of 60th Street, but not including the FDR Drive, the West Side Highway, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street. Id. § 1704(1)–(2). The CBD includes highways that have received federal aid pursuant to Title 23, which are part of the "National Highway System" ("NHS"). 23 U.S.C. § 103(a). Some of these highways, like I-78, which includes the Holland Tunnel, are part of the "Interstate System," a subset of the NHS built starting in the 1950s to connect major metropolitan areas and industrial centers and to serve the national defense. Id. § 103(c). Other highways in the CBD, like 33rd Street, are part of the NHS but are not on the Interstate System.

Because some highways in the CBD were constructed with federal funding, the federal government has taken the position that Section 301 of Title 23 requires that those highways be "free from tolls of all kinds." 23 U.S.C. § 301. Section 301's general

[4] As outlined in this section, this opinion addresses Defendants' motion to dismiss on the grounds of Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). Defendants also sought to move pursuant to Rule 12(b)(3), which provides for dismissal for "improper venue." See Defs.' Mot. at 1, 20 n.8. Given that the court already considered Defendants' arguments as to improper venue in its denial of the motion to transfer, see Order Denying Motion to Change Venue, ECF No. 52, the court will not reconsider rejection of Defendants' position as to improper venue, absent new evidence or an intervening change in the law.

ban on tolling originally derives from the Federal-Aid Road Act of 1916 (39 Stat. 355), which was put into place at a time when "toll roads came to be regarded as obstacles to the free flow of commerce." However, "exceptions to the general ban on tolls now cover the vast majority of federal aid roads and bridges." Id. Indeed, Section 301 references a broad exception in Section 129 of Title 23, which allows tolling for projects as wide-ranging as the construction of new toll highways, construction of new lanes and conversion into toll highways, and reconstruction of toll-free highways and conversion into toll facilities. 23 U.S.C. §§ 301, 129(a)(1)(A), (F).

Following the passage of the TMA, the TBTA along with the New York State and City Departments of Transportation (collectively, the "Project Sponsors") began discussions with the Federal Highway Administration ("FHWA"), which recommended that they pursue tolling authorization under the Value Pricing Pilot Program ("VPPP"). Originally called the "Congestion Pricing Pilot Program," the VPPP was enacted as part of the Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, 105 Stat. 1914 ("ISTEA"), which made numerous modifications to Title 23, with the goal of providing "states greater flexibility to operate toll facilities and use toll revenues for a variety of transportation projects." See Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth., 886 F.3d 238, 242 (2d Cir. 2018). To that end, the VPPP directed the Secretary of Transportation to "solicit" State and local government participation in "congestion pricing pilot projects," ISTEA § 1012(b), which was later amended to "value pricing pilot programs" as part of the Transportation Equity Act for the 21st Century ("TEA-21C"), Pub. L. No. 105-178, § 1216(a), 112 Stat. 107, 211–12 (1998) (codified at 23 U.S.C. § 149).

Although the VPPP did not define the term “congestion pricing” (and does not define “value pricing” today), the concept of congestion pricing has long been understood to mean “cordon pricing”—i.e., tolls applied across a geographic area rather than to one particular road. See MTA v. Duffy, 784 F. Supp. 3d 624, 676–78 (S.D.N.Y. 2025) (describing relevant background in detail). To implement a congestion pricing project, the VPPP provides that the Secretary “may enter into cooperative agreements with as many as 15 such State or local governments or public authorities,” VPPP, cl. 1, and the “Federal share payable for such programs shall be 80 percent,” for a maximum period of three years, id., cl. 2. Those funds came from the federal Highway Trust Fund, with amounts appropriated by Congress through fiscal year 2012. Id., cl. 8; Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109-59, § 1604(a), 119 Stat. 1144, 1249 (2005) (funding the VPPP through 2009), extended through March 31, 2012 by Surface and Air Transportation Programs Extension Act of 2011, Pub. L. No. 112-30, § 111, 125 Stat. 342, 343 (2011).

Finally, Clause 4 of the VPPP today makes clear that “[n]otwithstanding sections 129 and 301 of title 23 … the Secretary shall allow the use of tolls on the Interstate System as part of any value pricing pilot program under this subsection.” In its original iteration, at a time when the Secretary was limited to five cooperative agreements, Clause 4 provided that “the Secretary shall allow the use of tolls on the Interstate System as part of a pilot program under this section, but not on more than 3 of such programs.” ISTEA § 1012(b)(4). In TEA-21C, which, as noted, replaced the term “congestion pricing” with “value pricing,” Congress increased the number of cooperative agreements the Secretary could enter into

from five to fifteen, and it removed the three-program cap on the number of programs that could impose tolls on the Interstate System, specifically. TEA-21C § 1216(a).

Following the FHWA's recommendation to pursue authorization under the VPPP, the Project Sponsors engaged in a multi-year process of environmental analysis of the proposed plan under the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. Ultimately, on November 21, 2024, FHWA and the Project Sponsors entered into a cooperative agreement under the VPPP. See VPPP Agreement, ECF 33-4. The VPPP Agreement provides that the TBTA is authorized to "operate the Project as a toll Project in accordance with the provisions of this Agreement and as a value pricing project," id., cl. 1, and that "the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds," id., cl. 5. The Agreement also provides the FHWA with various reporting and notice rights, and requires TBTA to "comply with all Federal laws and requirements applicable to this project." Id., cls. 4, 7–9. Finally, as to termination, the Agreement provides solely that the parties "will work with FHWA to return the Project to its original operating condition if TBTA decides to discontinue tolls on the Project." Id., cl. 11.

In late 2025, Plaintiffs commenced this case on behalf of a putative nationwide class of toll payers, seeking to stop the Program and obtain a refund of all tolls. See Compl. They claim the Program violates Section 301 because: (1) the VPPP only permits tolling on Interstate System highways, and the CBD contains non-Interstate System highways, (2) the federal government's lack of continued funding amounts to an implied repeal of the statute, and (3) the Secretary rescinded approval. Id. ¶¶ 4, 21, 25–27. Despite anchoring

their claims in federal law, Plaintiffs do not sue under federal law. Instead, they assert state common law claims for Illegal Exaction and Money Had and Received (Counts I & II), as well as claims for declaratory and injunctive relief (Counts III & IV).

## III. Discussion

Defendants' motion is premised on four separate grounds as to why dismissal is appropriate. First and foremost, Defendants maintain that this matter should be dismissed as the court lacks personal jurisdiction over them. See Defs.' Mot. at 14–20. Alternatively, Defendants contend that this action cannot proceed as there is no private right of action to enforce § 301, and that any state law mechanism for Plaintiffs' claims is ineffective or even preempted by federal law. Id. at 20–28. Defendants also raise a handful of "other reasons" as to why the court should dismiss Plaintiffs' state law claims without reaching the merits. See id. at 43–50. Finally, Defendants maintain that Plaintiffs' claims cannot succeed on the merits as the proper statutory interpretation demonstrates that the FHWA lawfully authorized the congestion pricing program under the VPPP. Id. at 28–43.[5]

### A. Personal Jurisdiction

The court starts with the threshold issue of personal jurisdiction. General jurisdiction is not alleged, so the parties agree that Plaintiff carries the burden of establishing specific jurisdiction by demonstrating: "(1) the defendants have purposefully directed activities

---

[5] Because the court agrees with Defendants' arguments that dismissal is appropriate under Rule 12(b)(6), the court does not reach the parties' arguments as to the merits, nor Defendants' "other" arguments as to why Plaintiffs' claims may warrant dismissal. Similarly, given these findings, the court need not address Plaintiffs' contention that Defendants waived arguments challenging personal jurisdiction.

at the forum, (ii) the litigation arises out of or relates to at least one of those activities, and (iii) the exercise of jurisdiction comports with 'fair play and substantial justice.'" See Pls.' Resp. at 5 (citing O'Connor v. Sandy Lane Hotel, 496 F.3d 312, 317 (3d Cir. 2007)); see also Defs.' Mot. at 14 (providing same standard as set forth in Danziger & De Llano, LLP v. Morgan Verkamp LLC, 948 F.3d 124, 129–30 (3d Cir. 2020)).

Defendants maintain that Plaintiffs have failed to meet that burden in their Complaint despite including allegations as to the impact of tolls on New Jersey residents as well as allegations regarding the role of TransCore, an entity with a contractual relationship with the MTA, which is alleged to have a satellite office in New Jersey responsible with providing some services to the congestion pricing program at issue in this matter. See Defs.' Mot. at 15–20. Defendants explain that the fact that some of the named Plaintiffs may have incurred tolls from the program, and even received bills at their respective New Jersey residence, is not enough to establish personal jurisdiction. Id. at 15–16. Second, Defendants contend that Plaintiffs' reference to the TBTA's contractual arrangement with TransCore also fails to establish sufficient contacts between Defendant and New Jersey because "Plaintiffs' claims here do not 'arise out of or relate to' TransCore's services. Id. at 17–19.

Plaintiffs respond that "the facts readily establish that [Defendants] have purposefully directed their congestion-pricing activities at New Jersey." Pls.' Resp. at 6. Plaintiffs highlight the role of TransCore in conducting manual image review, among other tasks, for the congestion pricing program in New Jersey. Id. (citing jurisdictional discovery). Plaintiffs further note that "Defendants' program relies on an express reciprocity agreement

with the New Jersey Turnpike Authority, to exchange drivers' data on a daily basis for the purpose of collecting tolls from New Jersey motorists." Id. at 7. Taken together, Plaintiffs maintain that these facts demonstrate that "Defendants have 'deliberately extended [their] business into New Jersey" and cannot call their contacts 'random, isolated, or fortuitous' [as] the congestion-pricing program is directed at New Jersey 'by design.'" Id. (quoting Rains v. Jaguar Land Rover N. Am., Court No. 22-cv-4370, 2025 WL 2717805, at *6 (D.N.J. Sept. 24, 2025)).

The court agrees with Plaintiffs that personal jurisdiction exists. The facts, particularly those relating to the operation of the program by TransCore, as alleged in the Complaint and recounted above, demonstrate that Plaintiffs have met their burden on the first two elements, i.e. showing that the Defendants have purposefully directed activities at the forum and that the litigation arises out of or relates to at least one of those activities. Turning to the third factor, Plaintiffs maintain that "Defendants have not even tried to meet their burden to 'present a compelling case" to establish circumstances that 'would render jurisdiction unreasonable.'" See Pls.' Resp. at 8 (quoting Burger King v. Rudzewicz, 471 U.S. 462, 477 (1985)). Given Defendants' concessions as to the limited burdens and relative convenience presented by the District of New Jersey as a forum, the court concludes that the exercise of jurisdiction over Defendants in this matter comports with "fair play and substantial justice." See O'Connor, 496 F.3d at 317. Therefore, the court will deny Defendants' motion to dismiss as to its arguments that there is a lack of personal jurisdiction.

**B. Private Right of Action**

The court next turns to Defendants' arguments under Rule 12(b)(6) that Plaintiffs' action cannot proceed because Section 301 does not provide a private right of action. See Defs.' Mot. at 20–28. Defendants contend that "Plaintiffs do not have a right to sue to enforce Section 301." Id. at 20. Plaintiffs do not dispute that no private right of action exists under the federal statute and instead maintain that common law rights provided by state law suffice to maintain their action. See Pls.' Resp. at 10–13. Anticipating that position, Defendants maintain that Plaintiffs cannot rely on state law to provide a cause of action where Congress chose not to include one under federal law. See Defs.' Mot. at 23–24 (relying on Astra USA, Inc. v. Santa Clara Cnty., 563 U.S. 110 (2011)).

The plaintiffs in Astra sought to bring state law contract claims to enforce the terms of a federal statute imposing pricing conditions on participants in a Medicaid program. The U.S. Supreme Court concluded that the state law contract claims, predicated on enforcing the terms of a federal statute, should be dismissed in circumstances where allowing them to go forward would render Congress's decision not to create a private right of action "meaningless" and "undermine" Congress's decision to vest "enforcement authority" in the agency. See Astra, 53 U.S. at 120–22. Defendants maintain that "[a]s in Astra, Plaintiffs here assert state law claims that are predicated on an alleged violation of federal law that they have no right to enforce. That sort of end-run around Congress is not permissible." Defs.' Mot. at 24 (citing Astra along with various other cases dismissing state law claims where no private right of action existed under federal law). Defendants further explain how the federal courts of appeals, when considering claims presented in similar

circumstances, have consistency concluded that dismissal is appropriate. Id. at 23–24 (citing Umland v. PLANCO Fin. Servs. Inc., 542 F.3d 59 (3d Cir. 2008), Bauer v. Elrich, 8 F.4th 291(4th Cir. 2021), and others); see also Defs.' Reply at 8–9.

Plaintiffs maintain that Astra and other cases relied upon by Defendants are distinguishable on their facts and do not justify dismissal of the present action. See Pls.' Resp. at 11–12 (insisting that Astra is "unrecognizable to the facts of this case" and that the other cited precedent Defendants rely upon, such as Umland and Bauer, are all "similarly inapposite"). Defendants disagree, highlighting that Plaintiffs' purported factual distinctions have no bearing on the holding of Astra nor its application in this context. See Defs.' Reply at 7–10.

At least one other court has dismissed claims, similar to those of Plaintiffs here challenging the congestion pricing program as unlawful, after finding that there is no private right of action under Section 301. See Blumencranz v. Hochul, Court No. 1:25-cv-01787, ECF No. 35 (S.D.N.Y. July 14, 2026) (Liman, J.) (opinion granting unopposed motion to dismiss). Defendants emphasize that courts considering other claims involving Section 301 are nearly unanimous over the past 30 years in reaching the same conclusion—namely, that there is no private right of action under Section 301. See Defs.' Mot. at 20–22 (collecting cases); Defs.' Reply at 7 n.7.

Plaintiffs contend in a footnote that "Defendants' argument erroneously conflates the availability of a federal statutory private right of action with the claims presented here, which involve the long-recognized and accepted 'presence of a federal issue in a state-created cause of action.'" Pls.' Resp. at 11 n.5 (quoting Merrell Dow Pharms. v. Thompson,

478 U.S. 804, 810 (1986) and also citing Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. 308, 316 (2005)). Defendants point out, however, that Plaintiffs reliance on those cases is misplaced, as Merrill Dow and Grable address the propriety of jurisdiction for a state-law claim that raises federal issues and not whether state law claims may provide a cause of action to enforce a federal statute in the absence of a federal cause of action. See Defs.' Reply at 11 n.9.

While both parties cite to various case precedents in support of their argument, the decision in Bauer v. Elrich, 8 F.4th 291 (4th Cir. 2021) is particularly instructive given that the majority and the dissent appear to split precisely along the question as to whether the lack of a private right of action in a federal statute is fatal to a state law claim seeking to enforce that federal statute. Although Bauer is an opinion from the U.S. Court of Appeals for the Fourth Circuit, and is therefore not controlling, the logic underlying its holding appears to apply directly in the circumstances presented.

In Bauer, plaintiffs "asserted that the [Emergency Assistance Relief Payment Program, a COVID-19 aid program that provides cash assistance to residents, including foreign nationals present in the country,] violated a federal statute, 8 U.S.C. § 1621(a), which, subject to a few exceptions, generally prohibits undocumented persons from receiving state and local benefits." 8 F.4th at 295. The majority concluded that the "lack of a private right of action in Section 1621 is fatal to the plaintiffs' claim." Id. at 299. Relying on Astra, the court held that "plaintiffs cannot use the procedural mechanism of Maryland taxpayer standing to bring a claim that is 'one and the same' as a purported enforcement action brought directly under Section 1621." Id. at 300 & n.6 (further noting impropriety of

state law mechanisms where "the ultimate goal of the plaintiffs' claim … is to enforce the federal statute" in circumstances with deliberate absence of federal cause of action). Ultimately, the majority held "that the plaintiffs' claim raises a substantial federal question, but that the plaintiffs have no right to enforce the federal statute in question. These conclusions are not only compelled by Supreme Court and Circuit precedent, but also promote the required allocation of responsibility between state and federal courts, and between the judicial and legislative branches of government." Id. at 301–02.

The dissent, by contrast, maintained that "the validity of the [Plaintiffs'] claim does not turn on whether there is a private cause of action under [the federal statute]. Instead, it turns on…federal preemption." Bauer, 8 F.4th at 307 (rejecting majority's reliance on Astra to conclude that validity of claim "does not turn entirely on the absence of a statutory private right of action"). Instead, the dissent maintains that in situations where a state cause of action hinges on a violation of federal law, the necessary inquiry is whether federal preemption applies. Id. at 307–08 ("The absence of a private right of action in a federal statute, standing alone, does not necessarily preclude a state from creating a state law cause of action that adopts the standard of that federal statute. Accordingly, I would remand to the district court to consider, in the first instance, whether the [Plaintiffs] have pled a viable state law claim that is not preempted by federal law.").

The parties' positions appear to mirror those of the majority and dissent in Bauer, with Defendants promoting the majority's view and Plaintiffs encouraging the court to adopt the dissent's position. Ultimately, the court agrees with Defendants that the decision in Astra and the majority opinion in Bauer demonstrate that Plaintiffs cannot rely on state law

to provide a cause of action that is wholly predicated on violation of the federal statute. See Defs.' Reply at 7–10 (explaining how federal case law is in accord with New York precedent holding that state common law claims cannot proceed where they are "predicated solely" on statutes that lack private right of action (quoting Schlessinger v. Valspar Corp. 21 N.Y.3d 166, 171–72 (2013) and citing Han v. Hertz Corp., 12 A.D.3d 195 (1st Dep't 2004))).

The court agrees with Defendants that the weight of authority in the Third Circuit supports dismissal here due to a lack of private right of action. After careful review, the court concludes that Plaintiffs' invocation of state common law cannot salvage its attempt to bring litigation to enforce the provisions of Section 301. The Astra, Umland, and Bauer decisions make clear that plaintiffs cannot maintain state law claims that are "in substance one and the same" as a suit to enforce the governing statute directly. Presently, as in Astra, Plaintiffs' claims purporting to rely on state law to enforce the terms of Section 301 are "incompatible with the statutory regime." See Astra, 563 U.S. at 113; see also Bauer, 8 F.4th at 299–300 (quoting Astra, 563 U.S. at 114, to state that "[u]nder such circumstances, permitting a [state law claim to go forward] 'would allow third parties to circumvent Congress's decision not to permit private enforcement of the statute.'"); Umland, 542 F.3d at 66 (rejecting a similar attempt to allow plaintiffs to "use state common law to circumvent the absence of a private right of action" under Federal Insurance Contributions Act). Accordingly, the court will grant Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

**IV. Conclusion**

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) is denied; it is further

**ORDERED** Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is granted; and it is further

**ORDERED** that the Complaint is dismissed.

/s/ Leo M. Gordon
Leo M. Gordon, Judge
U.S. Court of International Trade
(sitting by designation in the District of New Jersey)

Dated: November 13, 2026
Newark, New Jersey